**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GLENN R. EDWARDS, INC. DBA EDWARDS DENTAL and DANIEL A. NARUP DMD., LLC, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 4:20-cv-00877 |
| | ) | |
| v. | ) | |
| | ) | |
| TRAVELERS COMPANIES, INC.; TRAVELERS CASUALTY INSURANCE COMPANY and THE PHOENIX INSURANCE COMPANY, | ) ) ) ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**PLAINTIFFS' CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ......................................................................... 1

II.    THE PARTIES............................................................................................ 4

III.   JURISDICTION AND VENUE ................................................................. 6

IV.    FACTUAL ALLEGATIONS ..................................................................... 6

   A.  The Global COVID-19 Pandemic.......................................................... 6

   B.  Steps Taken by Authorities in Missouri to Control the Pandemic...................................... 9

   C.  Standards and Recommendations Related to the Pandemic for Dental Practices ........... 10

   D.  The Devastating Impact of the COVID-19 Pandemic on Dental Practices, Including Plaintiffs' Practices ................................... 14

   E.  Traveller's Business Insurance Policies........................................................................... 16

   F.  Travelers Refuses to Honor Its Policies by Providing Coverage..................................... 21

V.     CLASS ALLEGATIONS ........................................................................ 25

VI.    JURY DEMAND ..................................................................................... 27

COUNT I: Business Income Breach Of Contract......................................................................... 27

COUNT II: Breach of the Implied Covenant of Good Faith and Fair Dealing Applicable to Business Income ........................................ 29

COUNT III: Declaratory Relief Applicable to Business Income ................................................. 30

COUNT IV: Extra Expense Breach of Contract........................................................................... 31

COUNT V: Breach of the Implied Covenant of Good Faith and Fair Dealing Applicable to Extra Expense .............................................. 32

COUNT VI: Declaratory Relief Applicable to Extra Expense .................................................... 34

VII.   PRAYER FOR RELIEF ......................................................................... 35

PLAINTIFFS GLENN R. EDWARDS, INC. DBA EDWARDS DENTAL and DANIEL A. NARUP DMD, LLC (collectively "Plaintiffs"), individually and on behalf of other similarly situated persons and entities operating dental practices in Missouri, make the following allegations based upon information and belief, except as to those allegations specifically pertaining to Plaintiffs, which are based on their respective personal knowledge. Plaintiffs bring this action for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory and injunctive relief against DEFENDANTS TRAVELERS INSURANCE COMPANY; TRAVELERS CASUALTY INSURANCE COMPANY; and THE PHOENIX INSURANCE COMPANY (collectively "Defendant" or "Travelers"), demanding a trial by jury.

## I. NATURE OF THE ACTION

1.   Plaintiffs have been offering dental services in St. Louis County for many years. To make sure that they would be protected if they were forced to temporarily cease their practices because of unanticipated events beyond their control, they each purchased business insurance policies from Travelers. Those policies are attached hereto as Exhibits A and B (Edwards) and C and D (Narup).

2.   Such an event, namely the worst health crisis to hit the State of Missouri, the United States, and indeed the world in over a century, arrived in early 2020 in the form of a worldwide pandemic of a disease called COVID-19, causing a massive number of illnesses and numerous deaths.

3.   Like Plaintiffs, many other dental practices have purchased insurance from Travelers to protect against losses from catastrophic events like the current unforeseen COVID-19 pandemic. These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, or curtailed because of direct physical loss of or damage to the property. This coverage, commonly known as "business

1

interruption" or "business income" coverage, is standard in most all-risk commercial property insurance policies.

4.    Insurance is a way to manage risk, providing protection from financial loss. It is particularly appropriate – indeed, vital – for protection against losses that, while unlikely to occur, would be financially devastating if they do occur. As Travelers says on its website, "Commercial insurance can help you avoid costly disruptions":[1]



5.    Why is business insurance important? On this web page, Travelers explains that it is "critical" because, without it, a significant loss could be devastating to the livelihood of a business: [2]

---

[1] https://www.travelers.com/business-insurance (accessed 6/22/2020).
[2] https://www.travelers.com/business-insurance (accessed 6/22/2020) (emphasis in the screenshot is added).

**Why Business Insurance Is Important**    ⌃

Business insurance coverage is critical to protecting your company from risks, including property loss and repairing or replacing property, such as after a fire, storm or theft. Business insurance can help cover the costs of legal claims made against your business and can help cover an injured worker's lost wages. Without insurance, a significant loss could be devastating to the livelihood of your business. Some states also require businesses hold certain types of insurance coverages in order to legally operate there.

6.   A significant loss that was devastating to the livelihood of their businesses is exactly what happened to Plaintiffs and other Missouri dentists when COVID-19 struck in early 2020.

7.   As a result of the pandemic, in March, 2020, the Centers for Disease Control ("CDC"), and American Dental Association ("ADA") recommended that all dentists in the United States postpone elective, or non-urgent dental procedures to reduce the risk of spreading this disease.[3] The Missouri Dental Board urged Missouri dentists to adhere to those recommendations.[4]

8.   That month, in response to these recommendations and because of the risk of continuing their dental practices during the pandemic, Plaintiffs shut down their practices. For approximately the next two months, their practices were completely closed except for seeing only a handful of emergency patients.

9.   According to surveys conducted by the American Dental Association, all other dental practices in Missouri also completely ceased seeing patients for elective or non-urgent visits for the same reasons.

10. However, despite the business income coverage in its policies, Travelers refuses to pay for business income losses and covered expenses incurred by policyholders as a result of the physical loss of their insured property arising from the COVID-19 pandemic.

---

[3] https://content.govdelivery.com/accounts/MODIFP/bulletins/282c1ac (accessed 5/8/2010).
[4] https://content.govdelivery.com/accounts/MODIFP/bulletins/282c1ac (accessed 5/11/2020).

11. Travelers seeks to justify its decision to unilaterally and preemptively deny coverage owed to its insureds on grounds that are patently specious. It states that its Business Interruption polices "require losses to be caused by *direct physical damage to property* from a covered cause of loss."[5] But it is blatantly misquoting the policies, which in fact cover the loss of business income "caused by direct physical *loss of* or damage to covered property" (Ex. B at 15-16; Ex. D at 22-23; emphasis added). Plaintiffs suffered a "loss of" their properties when they were unable to use them for the practice of dentistry and their patients suffered a loss of the properties when they were unable to access them for dental services.

12. Plaintiffs bring this action on behalf of a class of Missouri dental practices (as defined below) that purchased standard Travelers commercial property insurance policies providing for business income loss and extra expense and who have suffered business income losses and had to pay extra expenses.

13. This action also seeks a declaratory judgment that Travelers is contractually obligated to pay these losses. In addition, Plaintiffs seek damages, attorneys' fees and costs, and any other relief that this Court deems equitable and just, arising out of Travelers' breach of contract and wrongful conduct alleged herein.

## II.  THE PARTIES

14. Plaintiff Glenn R. Edwards, Inc., dba Edwards Dental ("Plaintiff Edwards"), is a dental practice located at 777 South New Ballas Road, Suite 300 East, in St. Louis County, Missouri. Dr. Glenn R. Edwards has practiced dentistry through that entity for many years. Aside from

---

[5] The Travelers Companies, Inc. First Quarter 2020 Results Conference Call Tuesday, April 21, 2020, 9:00 AM Eastern at 5 (Statement of Chairman and CEO Alan Schnitzer), available at http://investor.travelers.com/Cache/IRCache/adba52c1-028b-76ca-5459-d12a83d6fe6d.PDF?O=PDF&T=&Y=&D=&FID=adba52c1-028b-76ca-5459-d12a83d6fe6d&iid=4055530 (accessed 6/24/2020; emphasis added); *see also* Travelers website page "COVID-19: Business Interruption General Insurance," https://www.travelers.com/about-travelers/covid-19-business-interruption (accessed 6/22/2020) (policy only covers "loss of income due to direct physical loss or damage to covered property…").

giving his patients regular checkups and teeth cleaning, the treatments he provides include dental fillings, dental sealants, dentures, dental bridges, dental implants, dental crowns and tooth extractions, as well as dental bonding, porcelain veneers, inlays, onlays and teeth whitening.

15. Plaintiff Daniel A. Narup DMD., LLC ("Plaintiff Narup") is a dental practice located at 3701 South Lindbergh Blvd Suite 200, Saint Louis, MO 63127, in St. Louis County, Missouri. Dr. Daniel A. Narup has practiced dentistry through that entity for many years. Aside from giving his patients regular checkups and teeth cleaning, the treatments he provides include dental fillings, dental sealants, dentures, dental bridges, dental implants, dental crowns and tooth extractions, as well as dental bonding, porcelain veneers, inlays, onlays and teeth whitening.

16. Defendant The Travelers Companies, Inc. ("Travelers Companies"), is a holding company incorporated in Minnesota with its principal place of business at One Tower Square, Hartford, Connecticut 06183. It is principally engaged, through its subsidiaries, in providing a wide range of commercial and personal property and casualty insurance products and services to businesses, government units, associations and individuals. Two of the companies through which it provides such products and services are Defendant Travelers Casualty Insurance Company and Defendant The Phoenix Insurance Company.

17. Travelers Companies is one of the 30 industrial companies that make up the Dow Jones Industrial Average. It boasts that it "has approximately 30,000 employees and operations in the United States and selected international markets. The company generated revenues of approximately $32 billion in 2019."[6]

---

[6] http://investor.travelers.com/CorporateProfile (accessed 6/22/2020).

18. Defendant Travelers Casualty Insurance Company ("Defendant Travelers Casualty") is an insurance company incorporated in Connecticut with its principal place of business at One Tower Square, Hartford, Connecticut 06183.

19. Defendant The Phoenix Insurance Company ("Defendant Phoenix") is an insurance company incorporated in Connecticut with its principal place of business at One Tower Square, Hartford, Connecticut 06183.

## III. JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between at least one Defendant and at least one member of the class; there are more than one hundred members of the class; and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202 and is authorized to grant declaratory relief under these statutes.

21. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part, if not all, of the acts and omissions complained of in this action took place in this district.

## IV. FACTUAL ALLEGATIONS

### A. The Global COVID-19 Pandemic

22. According to the World Health Organization ("WHO"), COVID-19 is an infectious disease for which there are no vaccines or treatments.[7] It spreads easily from person-to-person.[8]

23. When an infected person coughs, sneezes, or even just talks, droplets with the infectious agent fly into the air from the person's nose or mouth and can thereby infect others. This can

---

[7] https://www.who.int/health-topics/coronavirus#tab=tab_1 (accessed 5/10/2020).
[8] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html#:~:text=On%20March%2011%2C%20the,of%20new%20influenza%20viruses. (accessed 5/10/2020).

occur even if the person is asymptomatic.[9] As WebMD states, "Some people who don't know they've been infected can give it to others. This is called asymptomatic spread. You can also pass it on before you notice any signs of infection, called presymptomatic spread."[10]

24.  Thus, absent testing, there is no way to know whether a person with whom one comes into contact might be spreading the disease.

25. The coronavirus can live in the air for up to three hours, be breathed in by others, and get into their lungs, where it can infect them.[11]

26. The coronavirus can also infect people who touch surfaces, such as countertops, doorknobs – and, of course, dental equipment – that contain the virus. It can live on plastic and stainless steel for up to three days.[12]

27. COVID-19 is a new disease. The first known outbreak was a cluster of cases of pneumonia in Wuhan, Hubei Province in China in December 2019.[13] The disease did not even have an official name when WHO declared a "Public Health Emergency of International Concern" on January 30, 2020.[14] The disease was given its name by WHO on February 11, 2020, short for "coronavirus disease 2019." [15]

28. After it was first discovered, COVID-19 spread rapidly. On March 11, 2020, "[d]eeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction, WHO made the assessment that COVID-19 can be characterized as a pandemic."[16]

---

[9] https://www.webmd.com/lung/coronavirus-transmission-overview#1 (accessed 5/10/2020).
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).
[14] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (accessed 5/10/2020).
[15] https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200211-sitrep-22-ncov.pdf?sfvrsn=fb6d49b1_2 (accessed 5/10/2020).
[16] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).

29. A pandemic is "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population."[17] To be classified as a pandemic, WHO requires "the worldwide spread of a new disease."[18]

30. At the point that WHO labeled COVID-19 a pandemic on March 11, the number of cases outside China in just the past two weeks had increased by 13-fold to 118,000 in 114 countries; more than 4,000 people had lost their lives, and as the Director-General of WHO stated, "[t]housands more [were] fighting for their lives in hospitals."[19]

31. According to the COVID Tracking Project, by that same date, March 11, 1,813 patients at that point had tested positive in the United States, and 43 patients had died.[20] From that date on, the number of cases and deaths increased rapidly. By March 17, 2020, less than a week later, when Governor Parson advised Missourians not to eat in restaurants, the number of cases nationwide had increased approximately 5 times to 8,863, and the number of deaths had increased by approximately three times to 120.[21]

32. By the time Missouri issued its "Stay at Home" Order on April 3, 2020, positive tests nationwide had increased *another 31 times* to 276,047 and deaths another *59 times* to 7,112.[22]

33. As of June 29, 2020, according to the *New York Times*, 2.6 million Americans have tested positive for COVID-19, and 126,000 have died from the disease.[23] That was more than any other country in the world and the 10th and 9th highest on a per capita basis, respectively.[24]

---

[17] https://www.merriam-webster.com/dictionary/pandemic (accessed 5/11/2020) (accessed 5/10/2020).
[18] https://www.who.int/csr/disease/swineflu/frequently_asked_questions/pandemic/en/ (accessed 5/10/2020).
[19] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (accessed 5/10/2020).
[20] https://covidtracking.com/data/us-daily (accessed 5/13/2020).
[21] https://covidtracking.com/data/us-daily (accessed 5/21/2020).
[22] https://covidtracking.com/data/state/missouri#historical (accessed 5/21/2020)
[23] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (accessed 6/29/2020).
[24] *Id.*

34. Missouri was hit by COVID-19 later than other states, but once it arrived it spread rapidly. As of March 11, 2020, when COVID-19 was first declared a worldwide pandemic, there was only one reported case in Missouri and no deaths. By March 17, there had been eight positive tests and still no deaths. But by April 3, when Gov. Parson issued his "Stay at Home" Order, positive tests had skyrocketed to 2,113 and 19 Missourians had died of the disease. As of June 29, there had been 21,600 cases, and 1,023 COVID-19 deaths in Missouri.[25].

35. The rate of infection in St. Louis County, where Plaintiffs practice, and the City of St. Louis, where some of their patients live, quickly caught up with the rest of the country. As of June 29, per 100,000 residents in the City and County respectively, there have been 800 and 648 cases and 52 and 57 deaths;[26] that compares to 790 cases and 39 deaths per 100,000 in the United States as a whole. [27].

**B. Steps Taken by Authorities in Missouri to Control the Pandemic**

36. Beginning in March, 2020, governmental authorities issued many orders in an attempt to protect their citizens from the COVID-19 pandemic. The measures taken by St. Louis County are typical. On March 13, 2020, St. Louis County declared a state of emergency.[28]

37. As COVID-19 continued to spread, St. Louis County issued a series of Stay at Home Orders.

38. On March 21, 2020, St. Louis County Executive Dr. Sam Page issued an Executive Order, commanding the Director of the St. Louis County Department of Public Health to issue an order directing that "people stay home when possible" other than, *inter alia*, to "perform tasks

---

[25] https://www.nytimes.com/interactive/2020/us/missouri-coronavirus-cases.html (accessed 6/29/2020)..
[26] https://www.nytimes.com/interactive/2020/us/missouri-coronavirus-cases.html (accessed 6/29/2020).
[27] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html   (accessed 6/29/2020).
[28] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/covid-19-public-health-emergency-order-and-proclamation.cfm; and https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/ (both accessed 5/11/2020).

*essential* to the health and safety of individuals, their families, their household members, and their pets, such as … visiting a health care professional or hospital ….”[29]

39. On March 23, 2020, the St. Louis County Director of Public Health issued a Stay at Home Order and, subsequently an Amended Stay at Home Order, that allowed residents to leave home to engage in "Essential Activities," including "Healthcare Operations," defined to include dentists. The Order was scheduled to remain in place until 11:59 April 22, 2020.[30]

40. That Order was amended on April 23, 2020, and again on May 4, 2020, extending the Stay at Home Order indefinitely.[31] On May 8, 2020, the St. Louis County Director of Public Health eased the restrictions somewhat, but still noted: "All Gatherings pose an increased risk of transmission and should be voluntarily avoided whenever possible."[32]

41. Because the Stay at Home Orders limited out-of-home activities to essential activities, they only allowed visits to a dentist for essential treatments.

**C.  Standards and Recommendations Related to the Pandemic for Dental Practices**

42. Even before the Stay at Home Order went into effect in St. Louis County, authorities were recommending that dental practices close.

---

[29] https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/ (accessed 5/11/2020) (emphasis added).
[30] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-amended-stay-at-home-order/; https://stlouisco.com/portals/8/docs/document%20library/CountyExecutive/Executive%20Orders/Stay%20at%20Home%20Order.pdf (both accessed 5/11/2020).
[31] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-extension-and-amendment-of-stay-at-home-order/; https://stlcorona.com/news/dph-covid-19-update-542020/ (both accessed 5/11/2020.
[32] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-business-and-individual-guidelines-for-social-distancing-and-re-opening/ (accessed 5/13/2020).

43. On March 16, the ADA recommended that dental practices "halt day-to-day non-emergency procedures."[33] On that date, ADA President Chad P. Gehani stated: "[T]he ADA recommends dentists nationwide postpone elective procedures for the next three weeks." [34]

44. On March 18, CDC urged all dentists to cancel, or at least postpone, all elective and non-urgent dental visits.[35]

45. The CDC explained that these recommendations were based on the risk of infection in dental offices, especially because of the spatter of bodily fluids and microorganisms:

> The practice of dentistry involves the use of rotary dental and surgical instruments (e.g., handpieces or ultrasonic scalers) and air-water syringes. These instruments create a visible spray that contains large particle droplets of water, saliva, blood, microorganisms, and other debris. This spatter travels only a short distance and settles out quickly, landing on the floor, nearby operatory surfaces, dental health care personnel (DHCP), or the patient. The spray also might contain certain aerosols.[36]

46. CDC went on to explain that the precautions it recommended in other healthcare settings were not possible for dental practices because dental settings "are not designed for or equipped to provide this standard of care. For example, most dental settings do not have airborne infection isolation rooms or single-patient rooms, do not have a respiratory protection program, and do not routinely stock N95 respirators."[37]

47. Accordingly, CDC recommended that "[s]ervices should be limited to urgent and emergency visits only during this period of the pandemic. These actions help staff and patients

---

[33] https://www.dentalproductsreport.com/dental/article/ada-isds-announce-recommendations-practices-close-due-coronavirus (accessed 6/15/2020).

[34] https://www.dentalproductsreport.com/dental/article/ada-isds-announce-recommendations-practices-close-due-coronavirus (accessed 6/15/2020).

[35] https://aonaffinity-blob-cdn.azureedge.net/affinitytemplate-dev/media/dentistsadvantagedev/media/risk/alerts/rmalert_coronavirus_march2020.pdf (accessed 6/24/2020).

[36] https://web.archive.org/web/20200327164143/https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/11/2020) (footnote omitted).

[37] https://web.archive.org/web/20200327164143/https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/11/2020).

stay safe, preserve personal protective equipment and patient care supplies, and expand available health system capacity."[38]

48. On March 23, 2020, the Missouri Dental Board, the body that regulates Missouri dentists, issued a bulletin stating that it supports the CDC and ADA recommendations described above, and it "urged Missouri dentists to adhere to them." The Board also "strongly encouraged" dentists "to take the necessary steps to insure the safety of their patients, staff and themselves by limiting opportunities for this virus to continue to spread."[39]

49. The above recommendations remained in effect through mid-May.[40] When the CDC reiterated them on April 7, 2020, it noted that the United States Occupational Safety and Health Administration had said that dental healthcare professionals were at very high risk of COVID-19 "as their jobs are those with high potential for exposure to known or suspected sources of the virus that causes COVID-19 during specific procedures."[41]

50. CDC did not provide recommendations for resuming non-emergency dental care until May 19, 2020. When it did so it stated: "Dental settings have unique characteristics that warrant specific infection control considerations."[42] Its specific recommendations included:

    a. Practice universal source control and actively screen for fever and symptoms of COVID-19 for all people who enter the dental facility.

    b. If patients do not exhibit symptoms consistent with COVID-19, provide dental treatment only after you have assessed the patient and considered both the risk to

---

[38] *Id.*
[39] https://content.govdelivery.com/accounts/MODIFP/bulletins/282c1ac (accessed 5/11/2020).
[40] https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/13/2020).
[41] https://web.archive.org/web/20200414014847/https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/1/11/2020).
[42] https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 6/15/2020).

the patient of deferring care and the risk to DHCP of healthcare-associated disease transmission.

c.  Ensure that you have the appropriate amount of personal protective equipment (PPE) and supplies to support your patient volume. If PPE and supplies are limited, prioritize dental care for the highest need, most vulnerable patients first.[43]

51. On April 29, 2020, a COVID-19 task force, part of a joint effort by the Office of the Missouri State Dental Director, the Missouri Dental Association, and the Missouri Primary Care Association, published recommendations for Missouri dentists relating to re-opening and listed May 4 as the "date that has been given for resuming operations in Missouri."[44] However, its guidance included screening staff and patients for COVID-19 symptoms, proper use of personal protective equipment, social distancing practices within offices, and other protective measures to ensure patient safety. *Id*. The task force further stated that dentists should avoid procedures that they are not comfortable performing based on the need to protect their patients and staff. *Id*.

52. This was similar to interim guidance issued by the ADA in April of 2020 regarding the re-opening of dental practices, which called for the "highest level of PPE available – masks, goggles and face shield – to help protect patients and the dental team . . ."[45] Other guidance included calling patients to inquire about their current health status, temperature screening, and social distancing measures. *Id*.

53. However, dentists had difficulty opening up at that time because of the unavailability of sufficient PPE. The *St. Louis Post-Dispatch* reported: "Survey data from the American Dental Association suggests that many dentists in Missouri don't have N95s. Of 125 dental practices

---

[43] https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 6/15/2020; emphasis added).
[44] https://sitefinity.ada.org/docs/librariesprovider30/publications/covid/task-force-guidelines-for-mo-dental-practices_042920.pdf?sfvrsn=2 (accessed 6/22/2020).
[45] https://www.ada.org/en/press-room/news-releases/2020-archives/may/as-dental-practices-resume-operations-ada-offers-continued-guidance (accessed 6/22/2020).

surveyed in Missouri the week of May 4, roughly a third had zero N95 masks in stock, according to data from the ADA's Health Policy Institute."[46] Moreover, only 27% of the dental practices surveyed said that they had "more than two weeks' worth of N95 masks in stock." *Id*.

### D. The Devastating Impact of the COVID-19 Pandemic on Dental Practices, Including Plaintiffs' Practices

54. In the face of the COVID-19 pandemic, Plaintiffs and other Missouri dentists had no choice but to shut down their practices except to see patients for non-elective and urgent care. Any reasonable dentist would have shut down except for such emergencies.

55. And that is what happened.

56. Plaintiff Edwards shut down its offices except for seeing emergency patients from March 19, 2020 until reopening on May 26.

57. Plaintiff Narup shut down its offices except for seeing emergency patients from March 18, 2020 until finally reopening on May 20.

58. Almost all other dental practices in Missouri also shut down their practices except for seeing emergency patients in March and kept them closed for approximately two months.

59. The ADA conducted a series of nationwide surveys of dentists beginning the week of March 23, 2020. That week, 87% of Missouri dentists' practices were either completely closed or closed except for emergency patients. The remainder were open but seeing fewer patients than usual.[47]

60. That was bad enough, but April was devastating to dentists' practices. By the next survey, the week of April 6, nationally 97% of dentists were seeing no patients at all or only

---

[46] https://www.stltoday.com/business/local/dentists-across-st-louis-searching-for-critical-ppe-needed-to-see-patients/article_bc9c62b3-8279-5888-b4f4-079786fb215b.html (accessed 6/22/2020).

[47] https://surveys.ada.org/results/public/YWRhc3VydmV5cy1VUl81aUlYMUVTTUh2Y0NSVU4tNWU3Yjg1YTJlOTQ5N2QwMDE2MjdkZmRh?_ga=2.157748348.732403168.1586962644-361293844.1518644424#/pages/Page_e3fd2e25-9bbd-43ce-8252-51794094ac72 (accessed 6/24/2020).

emergency patients, with the remainder seeing a smaller volume than usual. In Missouri, 95% were seeing emergency patients at most and the remainder seeing fewer patients than usual. Eighty percent of Missouri dentists were seeing a patient volume of less than 5% of the typical level, with another 10% at 5-10% of the typical level.[48]

61. The next survey, the week of April 20, was similar. That week again 97% of dentists in the United States were completely shut down except possibly for emergencies; the other few were open but had lower volume than usual.[49]

62. In Missouri that week, 90% were completely closed or seeing only emergency patients, with the rest seeing fewer patients than usual.[50]

63. Not surprisingly, the financial impact on dentists has been huge. The week of April 20, 77% of dentists collected less than 5% in fees compared to what was typical in their practice, and another 13% collected between 5 and 10%.[51]

64. Again, Missouri was typical, with 66% collecting less than 5% of the typical amount, and another 15% collecting between 5-10% during the week of April 20. Fewer than 5% collected even 76% or more of what was typical.[52]

65. In addition, dentists have had to incur extra expenses to re-open. Plaintiffs have had to buy items such as High Efficiency Air ("HEPA") filters, N95 masks, face shields, isolation gowns, sanitizer, and other items.

---

[48] Health Policy Institute, COVID-19: Economic Impact on Dental Practices (Week of April 6 Results), available at https://surveys.ada.org/reports/RC/public/YWRhc3VydmV5cy01ZThkZDViMDA3YTZhODAwMTAzZTViZTgtVVJfNWlJWDFFU01IdmNDUlVO (accessed 6/24/2020) at 1, 4, 10.

[49] Health Policy Institute, COVID-19: Economic Impact on Dental Practices (Week of April 20 Results), available at https://surveys.ada.org/reports/RC/public/YWRhc3VydmV5cy01ZTlkYjFlMTRlZDkxOTAwMTU4NTU4ZmItVVJfNWlJWDFFU01IdmNDUlVO (accessed 6/24/2020) at 1.

[50] Id. at 4.

[51] Id. at 6.

[52] Id. at 14.

15

**E.  Travelers' Business Insurance Policies**

66. In exchange for premiums paid by Plaintiffs to Defendant, Plaintiffs each obtained commercial insurance policies from Travelers.

67. Plaintiff Edwards' policy was POLICY NUMBER 680-8G065599-20-42, issued by Defendant Phoenix on 1/10/2020, for the period from 3/1/2020 to 3/1/2021 (Ex. A). Plaintiff Narup's policy was POLICY NUMBER: 680- 0F663106-19-42, issued by Defendant Travelers Casualty on July 29, 2019, for the period of 9/17/2019 to 9/17/2020 (Ex. C).

68. Each of these policies provides that it covers Business Income/Extra Expense Limit to the Actual Loss for 12 consecutive months. (Ex. A, at 5; Ex. C, at 6).

69. Each one states that Travelers would honor a claim under the insured's prior policy if it was broader than the current policy. Ex. A at 2; Ex. C at 4. Therefore, the Business Income coverage under Plaintiffs' prior policies was in effect during the COVID-19 pandemic shutdowns. Those are attached as Ex. B (Edwards) and Ex. D (Narup). (Ex. A and B are referred to herein collectively as "Edwards Policy"; Ex. C and Ex. D are referred to herein collectively as "Narup Policy." Those policies are collectively referred to as "The Policies").

70. The Policies each have a "Businessowners Property Coverage Special Form" that provides for Business Income and Extra Expense coverage. Ex. B at 14; Ex. D at 21.

71. The Businessowners Property Coverage Special Form states that Travelers "will pay for *direct physical loss of* or physical damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss." Ex. B at 14; Ex. D at 21 (emphasis added).

72. For Plaintiff Edwards those premises are located at 777 S New Ballas Rd, #300E, Saint Louis MO 63141. Ex. A at 4; Ex. B at 6. For Plaintiff Narup, those premises are located at 3701 S. Lindbergh Blvd., Suite 200, Saint Louis MO 63127. Ex. C at 5; Ex. D at 3. Those are the

16

locations where Plaintiff Edwards and Plaintiff Narup maintain and conduct their dental services, respectively.

73. As used in Businessowners Property Coverage Special Form, "Covered Property" means the buildings and structures at that address, including fixtures, machinery, and certain other property. In other words, the Covered Property is the office suites where Plaintiffs conduct their business. Ex. B at 14; Ex. D at 21.

74. The coverage provided by the policy includes loss of Business Income:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by *direct physical loss of* or damage to *property* at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

Ex. B at 15-16; Ex. D at 22-23 (emphasis added).

75. The COVID-19 pandemic caused a direct physical loss of Plaintiffs' Covered Property at their described premises by denying Plaintiffs the ability to physically access and use the property in the normal fashion in their business; it is therefore a covered loss.

76. The policy provides that, for purposes of the above provision, "suspension" includes "[t]he partial or complete cessation of your business activities." Ex. B at 52; Ex. D at 59. Because Plaintiffs' business activities suffered a partial or complete cessation, Plaintiffs each experienced a suspension.

77. "Operations" means "your business activities occurring at the described premises …." Ex. B at 50; Ex. D at 58. In other words, that is Plaintiffs' practice of dentistry.

78. "Period of restoration" means the period beginning "[w]ith the date of direct physical loss or damage, if the Declarations show Immediately for Period of Restoration- Time Period …." Ex. B at 50; Ex. D at 58. Both Policies so show (Ex. B at 10; Ex. D at 5) and therefore the period of restoration begins with the date of direct physical loss.

17

79. The "period of restoration" ends when the property is restored. Ex. B at 50; Ex. D at 58. Thus, the period of restoration is the period when the property cannot be used for Plaintiffs' business because of the COVID-19 pandemic.

80. The Policies also cover Plaintiffs' Extended Business Income for losses that occur after the property is restored, as follows:

> If the necessary "suspension" of your "operations" produces a Business Income loss payable under Paragraph **a.** Business Income above, we will also pay for the actual loss of Business Income you sustain during the period that:
>
> > (1) Begins on the date property is actually repaired, rebuilt or replaced and 'operations' are resumed; and
> >
> > (2) Ends on the earlier of:
> >
> > > (a) The date you could restore your "operations" with reasonable speed, to the level which would generate the Business Income that would have existed if no direct physical loss or damage occurred; or
> > >
> > > (b) Sixty consecutive days after the date determined in Paragraph (1) above.
>
> However, this extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Ex. B at 16; Ex. D at 23.

81. The Policies also cover Plaintiffs' Extra Expense. Ex. A at 5; Ex. C at 6. Extra Expense means:

> [R]easonable and necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss of or physical damage to property caused by or resulting from a Covered Cause of Loss.

Ex. B at 16; Ex. D at 23.

82. With respect to Extra Expense, The Policies provide:

(2) We will pay Extra Expense (other than the expense to repair or replace property) to:

    (a) Avoid or minimize the "suspension" of business and to continue "operations" at the described premises …

    (b) Minimize the "suspension" of business if you cannot continue "operations".

(3) We will also pay Extra Expense (including Expediting Expenses) to repair or replace the property, but only to the extent it reduces the amount of loss that otherwise would have been payable under Paragraph **a**,, Business Income.

Ex. B at 16; Ex. D at 23. Thus, The Policies cover the expense Plaintiffs paid for equipment such as HEPA filters and N85 masks necessary to reopen.

83. To be covered by The Policies, the loss must be "caused by or resulting from a Covered Cause of Loss." Ex. B at 14; Ex. D at 21. Covered Causes of Loss are defined as follows:

RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

    **a.** Excluded in Paragraph **A.5., EXCLUSIONS;** or

    **b.** Limited in Paragraph **B.** Limitations ….

Ex. B at 16-17; Ex. D at 23-24.

84. Because the COVID-19 pandemic created a risk of direct physical loss, it is a "covered cause of loss" unless excluded or limited. However, none of the Exclusions in Paragraph B or the Limitations in Paragraph A.4 apply to COVID-19. *See* Ex. B at 17, 35-39; Ex. D at 24, 42-46. Therefore, COVID-19 is a covered cause of loss.

85. The Policies contain an additional Endorsement entitled, "Exclusion of Loss Due to Virus or Bacteria." Ex. B at 110; Ex. D at 148. That provision states: "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." *Id*.

19

86. That Virus Exclusion does not apply to Plaintiffs' losses because their losses were not caused by a virus. There is no evidence that the virus has ever been in their premises. Plaintiffs' losses were caused by a pandemic and the precautionary measures taken by federal, state and local officials to prevent its spread.

87. Travelers could have employed broader causation language in the Virus Exclusion – as it does elsewhere in the Policy – and thereby excluded Plaintiffs' losses, but it did not.

88. For example, the General Exclusion provision in the Causes of Loss – Special Form states: "We will not pay for loss or damage caused directly or *indirectly* by any of the following. Such loss or damage is excluded *regardless of any other cause or event that contributes concurrently or in any sequence to the loss*." Ex. A at pdf. p. 35 (emphasis added). Travelers, however, elected to use the more restrictive causation language ("caused by or resulting from") in the Virus Exclusion.

89. Nor did Travelers incorporate the Virus Exclusion into Paragraph B, the Exclusions section of the Causes of Loss – Special Form. Thus, the "directly or indirectly" or "regardless of any other cause or event that contributes" language of Paragraph B does not apply to the Virus Exclusion.

90. Therefore, the Virus Exclusion does not apply if the virus causes the loss indirectly. Here, if the coronavirus has any causal relationship to Plaintiffs' losses, it is indirect.

91. Nor does the Virus Exclusion apply if there is any other cause or event that contributes concurrently or in any sequence to the loss. Here, the other causes are the pandemic, the orders by governmental and other authorities to stay at home, the urgings of scientific and professional groups like CDC and ADA to close dental practices, and the resulting decisions of Plaintiffs and other dental practices to close.

92. For all of these reasons, the virus exclusion does not apply to the losses of Plaintiffs and Class members due to the COVID-19 pandemic.

93. For the above reasons, Plaintiffs and Class members are entitled to coverage under the Business Loss provisions of The Policies.

**F.  Travelers Refuses to Honor Its Policies by Providing Coverage**

94. Travelers denies that the COVID-19 pandemic is a covered cause of loss and refuses to provide any coverage to Plaintiffs and Class members for their COVID-19 losses whatsoever.

95. Travelers has a page on its website entitled, "COVID-19: Business Interruption General Information," that purports to explain why its policies do not cover business losses due to the COVID-19 pandemic.[53] Here is a screenshot of the top of that page:



---

[53] https://www.travelers.com/about-travelers/covid-19-business-interruption (accessed 6/24/2020).

96. That page reproduces a letter that Travelers sent to New York policyholders that it recommends all of its policyholders read for an explanation of "business interruption coverage under our typical property insurance policies at a very high level."[54]

97. The letter misleadingly states: "Insurance for business interruption can provide coverage when a policy holder suffers a loss of income *due to direct physical loss or damage to covered property* at its location or another location. It does not cover loss of income due to market conditions, a slowdown of economic activity or a general fear of contamination. Nor does the policy provide coverage for cancellations, suspensions and shutdowns that are implemented to limit the spread of the coronavirus. These are not a result of *direct physical loss or damage*."[55] Here is a screenshot:

---

[54] https://www.travelers.com/about-travelers/covid-19-business-interruption (accessed 6/24/2020).
[55] https://www.travelers.com/about-travelers/covid-19-business-interruption (accessed 6/24/2020).

**Travelers Letter to New York Property Insurance Policyholders**

Dear Policyholder:

Travelers wants to provide certain information to policy holders explaining how our Business Insurance property coverage applies to business interruption loss due to COVID-19 (coronavirus).

Insurance for business interruption can provide coverage when a policy holder suffers a loss of income due to direct physical loss or damage to covered property at its location or another location. It does not cover loss of income due to market conditions, a slowdown of economic activity or a general fear of contamination. Nor does the policy provide coverage for cancellations, suspensions and shutdowns that are implemented to limit the spread of the coronavirus. These are not a result of direct physical loss or damage. Accordingly, business interruption losses resulting from these types of events do not present covered losses under our property coverage forms.

Even if there has been direct physical loss or damage to property, your policy contains a number of exclusions that are likely to apply to business interruption losses. The most important exclusion to note is the exclusion for losses resulting from a virus or bacteria, which would include coronavirus.

98. In that passage, Travelers blatantly misquotes its policies. The policies do not simply "provide coverage when a policy holder suffers a loss of income due to direct physical loss or damage to covered property." As shown above, they provide coverage for a "physical loss *of* or damage to" property. In purporting to describe its policies, Travelers omitted the word "of" to make it appear that a "loss *of* property" is not covered. But a "loss of property" is covered.

99.  That letter also argues that the Virus Exclusion blocks coverage but doesn't even address how the Virus Exclusion can apply to a loss indirectly caused by a virus when indirect effects are not written into this Exclusion as they are for other Exclusions. Nor does the letter address the fact that the Virus Exclusion doesn't say – as other exclusions do – that it applies even if there is

23

another cause that contributes, as there is here. Travelers is simply trying to mislead its policyholders into not submitting claims.

100. In a statement on April 21, 2020, during a conference call with independent financial analysts from Morgan Stanley, Wells Fargo, JP Morgan, Credit Suisse and other firms, Travelers Chairman and CEO Alan Schnitzer was even more misleading. He didn't even bother including "loss" at all. He said, "[O]ur commercial property insurance policies that include Business Interruption, including as a result of civil authority, require losses to be caused by direct physical damage to property from a covered cause of loss."[56] That is simply false. As Chairman Schnitzer surely knows, the policy covers more than just direct physical damage to property, but also physical loss of property.

101. With these and other statements, Travelers attempts to discourage policy holders from even making claims for business losses due to COVID-19.

102. Nevertheless, Plaintiffs made claims to Travelers for their business losses. Through counsel, Plaintiff Narup emailed a claim on June 15, 2020, and requested a response by June 22, and Plaintiff Edwards emailed a claim on June 16, 2020, and requested a response by June 23, 2020. Ex. E and Ex. F.

103. Travelers responded with emailed acknowledgements on June 16, 2020. Ex. G and Ex. H. It has made no further response. It has not agreed to the claims, asked for more time to respond, or requested additional information. It hasn't even pretended to make a good faith effort to investigate the claims. The claims were simply rejected without even the courtesy of an explanation.

---

[56] The Travelers Companies, Inc. First Quarter 2020 Results Conference Call Tuesday, April 21, 2020, 9:00 AM Eastern at 5 (Statement of Chairman and CEO Alan Schnitzer), available at http://investor.travelers.com/Cache/IRCache/adba52c1-028b-76ca-5459-d12a83d6fe6d.PDF?O=PDF&T=&Y=&D=&FID=adba52c1-028b-76ca-5459-d12a83d6fe6d&iid=4055530

## V.  CLASS ALLEGATIONS

104. Plaintiffs bring this action on behalf of themselves and as representatives of all others who are similarly situated. Pursuant to Rules 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following classes:

> a. All persons and entities operating dental practices in Missouri with Business Income (including Extended Business Income) coverage issued by Defendant that made claims with any Defendant for suspension (*i.e.*, the partial slowdown or complete cessation of their business activities) of business related to COVID-19, and for which Defendant has denied a claim for the losses or has otherwise failed to acknowledge or accept as a covered loss, or pay for the covered losses (the "Business Income Coverage Class").

> b. All persons and entities operating dental practices in Missouri with Extra Expense coverage issued by Defendant that made claims with any Defendant for Extra Expense Coverage related to COVID-19 and for which Defendant has denied a claim for the expenses or has otherwise failed to acknowledge or accept as a covered expense, or pay for the covered expenses (the "Extra Expense Coverage Class").

105. Excluded from each of the above Classes is Defendant, including any entity in which any Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by a Defendant, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of a Defendant. Also excluded are the judges and court personnel in this case and any members of their immediate families.

106. Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

107. This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Rule 23 of the Federal Rules of Civil Procedure.

108. **Numerosity.** Fed. R. Civ. P. 23(a)(1). The members of each Class are so numerous that joinder of all members is impractical. The precise number of Class members can be ascertained from Defendant's records.

109. **Commonality and Predominance.** Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to each Class, which predominate over any questions affecting individual members of each respective Class. These common questions of law and fact include, without limitation:

   a. Whether Plaintiffs and the Class members suffered a covered loss under the common policies issued to members of the Class;

   b. Whether Defendant wrongfully denied all claims based on COVID-19;

   c. Whether Defendant's Business Income coverage applies to a suspension of business caused by COVID-19 and/or in response to the presence or threat of COVID-19;

   d. Whether Defendant's Extra Expense coverage applies to efforts to avoid or minimize a loss caused by COVID-19;

   e. Whether Defendant has breached its contracts of insurance through a uniform and blanket denial of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19;

   f. Whether Plaintiffs and the Class members suffered damages as a result of Defendant's actions.

110. **Typicality.** Fed. R. Civ. P. 23 (a)(3). Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Plaintiffs and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Defendant's unlawful conduct.

111. **Adequacy.** Fed. R. Civ. P. 23(a)(4). Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

112. **Superiority.** Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to

26

the financial resources of Defendant, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, Class members will continue to suffer losses and Defendant's misconduct will proceed without remedy. Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court. Finally, Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

113. **Injunctive and Declaratory Relief.** Fed. R. Civ. P. 23(b)(2). Defendant's unlawful and unfair conduct is uniform as to all members of each Class. Defendant has acted or refused to act on grounds that apply generally to each Class, so that final injunctive relief or declaratory relief is appropriate with respect to each Class as a whole.

## VI. JURY DEMAND

114. Plaintiffs demand a trial by jury on all claims so triable.

## COUNT I: BUSINESS INCOME BREACH OF CONTRACT

### (By Plaintiffs and the Business Income Coverage Class)

115. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

27

116. Plaintiffs bring this claim individually and on behalf of the Business Income Coverage Class against Defendant under Missouri law.

117. Plaintiffs' Policies and the policies of other Business Income Coverage Class members are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Plaintiffs for their covered losses under The Policies and for Class members' covered losses.

118. In The Policies, Defendant expressly agrees to pay for losses of Business Income incurred as a result of causes not excluded, including losses caused by the COVID-19 pandemic. Specifically, Defendant promises to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension.

119. Covered losses have resulted in business suspensions, which have caused Plaintiffs and Class members lost Business Income and Extended Business Income.

120. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under The Policies and other Class members' policies.

121. Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

122. Defendant, without justification, has refused performance under The Policies and other Class members' policies by denying coverage for these losses. Accordingly, Defendant is in breach of The Policies and other Class members' policies.

123. Due to Defendant's breaches of The Policies and other Class members' policies, Plaintiffs and other members of the Business Income Coverage Class have suffered actual and substantial damages for which Defendant is liable, in an amount to be proved at trial.

## COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO BUSINESS INCOME

### (By Plaintiffs and the Business Income Coverage Class)

124. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

125. Plaintiffs bring this claim individually and on behalf of the Business Income Coverage Class against Defendant under Missouri law.

126. Defendant has breached the duty of good faith and fair dealing owed to Plaintiffs and the Business Income Coverage Class in the following respects:

    a.   Unreasonably acting or failing to act in a manner that deprives Plaintiffs and the Class of the benefits of their policies;

    b.   Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiffs and the Class of the benefits of their policies;

    c.   Unreasonably attempting to discourage policyholders from making claims for losses due to COVID-19 by publicly misstating the provisions of its Business Insurance policies;

    d.   Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiffs' and the Class' claims;

    e.   Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiffs' and the Class' policies;

    f.   Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiffs' and the Class' claims;

    g.   Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiffs' and the Class' claims;

    h.   Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiffs' and the Class' losses;

    i.   Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

j.   Unreasonably failing to give at least as much consideration to the interests of Plaintiffs and the Class as it gives to its own interests;

k.   Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of its insureds as it gives to its own interests;

l.   Unreasonably placing its own financial interests above the interests of Plaintiffs and the Class; and

m.   Unreasonably engaging in a pattern and practice of placing its own financial interests above the interests of its insureds.

127. By acting in the aforementioned way, Defendant breached the implied covenant of good faith and fair dealing.

128. As a result of this breach, Plaintiffs and the Business Income Coverage Class have been damaged in an amount to be proven at trial.

## COUNT III: DECLARATORY RELIEF APPLICABLE TO BUSINESS INCOME

### (By Plaintiffs and the Business Income Coverage Class)

129. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

130. Plaintiffs bring this claim individually and on behalf of the Business Income Coverage Class against Defendant under Missouri law.

131. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

132. The Policies and the policies of other Business Income Coverage Class members are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Class members' losses for claims covered by the policy.

133. In these policies, Defendant expressly agrees to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under the policy.

Specifically, Defendant promised to pay for losses of business income sustained as a result of a business suspension.

134. A covered loss has resulted in business suspensions, which have caused Plaintiffs and Class members losses.

135. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under The Policies and other Class members' policies.

136. Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

137. Defendant, without justification, has refused performance under The Policies and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of The Policies and other Class members' policies.

138. Plaintiffs and the Class members seek a judicial determination of whether these policies provide coverage for Plaintiffs' and Class members' losses.

139. An actual case or controversy exists regarding Class members' rights and Defendant's obligations under the terms of the Class members' policies.

## COUNT IV: EXTRA EXPENSE BREACH OF CONTRACT
### (By Plaintiffs and the Extra Expense Coverage Class)

140. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

141. Plaintiffs bring this claim individually and on behalf of the Extra Expense Coverage Class against Defendant under Missouri law.

142. The Policies and the policies of other Extra Expense Coverage Class members are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Class members' losses for claims covered by these policies.

143. In The Policies and the policies of other Extra Expense Coverage Class members, Defendant expressly agrees to pay for extra expenses incurred as a result of the causes not excluded under the policies. Specifically, Defendant promises to pay amounts to avoid or minimize the losses from suspension of business and to continue 'operations' at Plaintiffs' and Class members' premises, to repair or replace any property, and other expenses.

144. A covered loss has resulted in business suspensions. These suspensions have caused Plaintiffs and Class members to incur extra expenses.

145. The extra expenses triggered the extra expense coverage under The Policy and other Class members' policies.

146. Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

147. Defendant, without justification, has refused performance under The Policies and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of these policies.

148. Due to Defendant's breach of The Policy and other Class member policies, Plaintiffs and other Class members have suffered actual and substantial damages for which Defendant areis liable, in an amount to be proved at trial.

**COUNT V: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO EXTRA EXPENSE**

**(By Plaintiffs and the Extra Expense Coverage Class)**

32

149. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

150. Plaintiffs bring this claim individually and on behalf of the Extra Expense Coverage Class against Defendant under Missouri law.

151. Defendant has breached the duty of good faith and fair dealing owed to Plaintiffs and the Extra Expense Class with respect to the Extra Expense provisions in the following respects:

    a.  Unreasonably acting or failing to act in a manner that deprives Plaintiffs and the Class the benefits of their policies;

    b.  Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiffs and the Class of the benefits of their policies;

    c.  Unreasonably attempting to discourage policyholders from making claims for Extra Expenses due to COVID-19 by publicly misstating the provisions of its Business Insurance policies;

    d.  Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiffs' and the Class' claims;

    e.  Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiffs' and the Class' policies;

    f.  Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiffs' and the Class' claims;

    g.  Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiffs' and the Class' claims;

    h.  Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiffs' and the Class' losses;

    i.  Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

    j.  Unreasonably failing to give at least as much consideration to the interests of Plaintiffs and the Class as it gives to its own interests;

k. Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of its insureds as it gives to its own interests;

l. Unreasonably placing its own financial interests above the interests of Plaintiffs and the Class; and

m. Unreasonably engaging in a pattern and practice of placing its own financial interests above the interests of its insureds.

152. By acting in the aforementioned way, Defendant breached the implied covenant of good faith and fair dealing with respect to the Extra Expense provisions of the policies.

153. As a result of this breach, Plaintiffs and the Extra Expense Coverage Class have been damaged in an amount to be proven at trial.

## COUNT VI: DECLARATORY RELIEF APPLICABLE TO EXTRA EXPENSE
### (By Plaintiffs and the Extra Expense Coverage Class

154. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

155. Plaintiffs bring this claim individually and on behalf of the Extra Expense Coverage Class against Defendant under Missouri law.

156. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

157. The Policies and the policies of other Extra Expense Coverage Class members are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

158. In these policies, Defendant expressly agrees to pay extra expenses incurred as a result of the causes not excluded under the policies. Specifically, Defendant promises to pay amounts

to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiffs' and Class members' premises, to repair or replace any property, and other expenses.

159. The COVID-19 pandemic has caused Plaintiffs and the Extra Expense Coverage Class covered losses.

160. These covered losses have resulted, and will result, in extra expenses, which have caused Plaintiffs and Class members losses.

161. These extra expenses triggered the Extra Expense coverage under The Policies and other Class members' policies.

162. Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

163. Defendant, without justification, has refused performance under The Policies and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of these policies.

164. Plaintiffs and the other Class members seek a judicial determination of whether the Extra Expense provisions of these policies provide coverage for Plaintiffs' and Class members' losses.

165. An actual case or controversy exists regarding Plaintiffs' and Extra Expense Coverage Class members' rights and Defendant's obligations under the terms of the Extra Expense provisions of The Policies and other Class members' policies.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment against Defendant, as follows:

1.  An order certifying appropriate classes and/or subclasses, designating Plaintiffs as the class representatives and their counsel as class counsel;

2.   A judicial declaration declaring the meaning of the provisions concerning the business

income coverage and extra expense coverage;

3.   An award of damages to Plaintiffs and the Class in an amount to be determined at trial;

4.   An order requiring Defendant to pay both pre- and post-judgment interest on any

amounts awarded, as allowed by law;

5.   An award of costs and attorneys' fees, as allowed by law; and

6. Such other or further relief as may be appropriate.

Dated: July 1, 2020                    Respectfully submitted,

**LAW OFFICE OF RICHARD S. CORNFELD, LLC**


By:   */s/ Richard S. Cornfeld*
     Richard S. Cornfeld, #31046MO
     Daniel S. Levy, #66039MO
     1010 Market Street, Suite 1645
     St. Louis, Missouri 63101
     P. 314-241-5799
     F. 314-241-5788
     rcornfeld@cornfeldlegal.com
     dlevy@cornfeldlegal.com

     And

     Anthony S. Bruning, #30906MO
     Anthony S. Bruning, Jr., #60200MO
     Ryan L. Bruning, #62773MO
     THE BRUNING LAW FIRM, LLC
     555 Washington Avenue, Suite 600
     St. Louis, Missouri 63101
     P. 314-735-8100 / F. 314-898-3078
     tony@bruninglegal.com
     aj@bruninglegal.com
     ryan@bruninglegal.com

     And

     Alfredo Torrijos (*Pro Hac Vice*)

36

ARIAS SANGUINETTI WANG & TORRIJOS, LLP
6701 Center Drive West, 14th Floor
Los Angeles, CA
T: (310) 844-9696
F: (310) 861-0168
alfredo@aswtlawyers.com

***Attorneys for Plaintiffs***